IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| EDWARD SHAVER, *Administrator of the Estate of Deceased Mark Shaver*, | ) ) ) | CASE NO. 5:11 CV 154 |
| | ) | JUDGE DONALD C. NUGENT |
| Plaintiff, | ) ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | WILLIAM H. BAUGHMAN, JR. |
| | ) | |
| BRIMFIELD TOWNSHIP, *et al.*, | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Defendants. | ) | |

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -2-

Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -3-
    A.    Overview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -3-
    B.    Preliminary observations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -5-
        1.    Medical opiate withdrawal protocol and form . . . . . . . . . . . . . . . -5-
            a.    Protocol . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -5-
            b.    POR form . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -7-
        2.    Prison opiate withdrawal policy . . . . . . . . . . . . . . . . . . . . . . . . -9-
    C.    Chronology of events . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -10-

Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -18-
    A.    Relevant law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -18-
        1.    Summary judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -18-
        2.    Deliberate indifference standard . . . . . . . . . . . . . . . . . . . . . . . -20-
        3.    Failure to train/maintaining a policy or custom . . . . . . . . . . . . . -22-
    B.    Application of relevant law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -24-
        1.    Non-medical jail staff . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -34-
        2.    Medical staff . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -34-
        3.    Conclusion – deliberate indifference . . . . . . . . . . . . . . . . . . . . -38-
        4.    Portage defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -38-
        5.    Conclusion – failure to train/maintaining a policy or custom . . -41-
        6.    Supplemental jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . -41-

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -42-

## Introduction

Before me by referral[1] in this matter arising under both state and federal law concerning the death in custody of Mark Shaver[2] are motions for summary judgment filed by defendants Portage County Board of Commissioners, Portage County, Sheriff David W. Doak, Corrections Officer Robert Jones, Corrections Officer Erica Tate, and Lieutenant Gregory Johnson ("Portage County defendants")[3] and defendants Health Professionals, Ltd. ("HPL"); Corrections Healthcare Companies, Inc. ("CHC"); Beth Cruise, LPN; Vondakae Weekly, LPN; Tamara Dalesandro, LPN; David McCown, LPN; Dawn Hayter, LPN; and Kelly English, LPN ("medical defendants").[4] Plaintiff Edward Shaver, administrator of the estate of the deceased, Mark Shaver, has responded in opposition to the motions.[5] Both the Portage County defendants[6] and the medical defendants[7] have replied to that opposition.

---

[1] ECF # 196.

[2] ECF # 111 (fourth amended complaint).

[3] ECF # 177. Other defendants listed on the original filing – Don Hall, Karen Herr, John Hostler, Sonny Jones, Sherry Metcalf, Michael Sams, Robert Symsek, Howard Wiggs, David Witt, and Roy Bice – have since been dismissed with prejudice. ECF # 193.

[4] ECF # 178. Stephen Battles, DO, who was listed as a medical defendant on the original motion, has been dismissed with prejudice. ECF # 193.

[5] ECF # 188.

[6] ECF # 191.

[7] ECF # 192.

For the reasons that follow, I will recommend that both motions for summary judgment be granted insofar as they concern the federal law claims and be denied without prejudice as they concern all claims asserted under Ohio law. Moreover, if the federal law claims are resolved in favor of all defendants, I further recommend that all remaining state law claims of the fourth amended complaint be dismissed without prejudice.

## Facts

### A.     Overview

Despite a voluminous file containing nearly 200 entries, and notwithstanding over 170 pages in briefs related to these motions, the Rule 56 facts relevant to adjudicating these motions are relatively straightforward and not in dispute.

Essentially, Shaver raises a single federal law claim under 42 U.S.C. § 1983 asserting that the defendants denied Mark Shaver adequate medical treatment while detained.[8] In that regard, he contends that the remaining Portage County defendants were either deliberately indifferent to Mark's opiate withdrawal condition[9] or were responsible for maintaining a

---

[8] ECF # 111 at ¶ 66.

[9] Corrections Officers Jones and Tate (*see*, ECF # 188 at 9-11); Lt. Johnson (*see*, ECF # 188 at 12).

custom or practice that resulted in him being given inadequate care.[10] As to the medical defendants, the complaint's sole federal claim alleges that the six named LPNs were deliberately indifferent to Mark Shaver's opiate withdrawal while he was incarcerated by allegedly failing to follow the appropriate treatment protocol and contacting the supervising physician.[11] He further contends that the two corporations that provided healthcare services to Portage County, and by whom the six LPNs were employed,[12] are liable under § 1983 for having the "custom" of ignoring the written policy on how opiate withdrawal should be treated.[13]

For the reasons that follow, I will recommending finding first that Shaver's opiate withdrawal was not an objectively serious medical condition and so cannot be the foundation for § 1983 liability. Alternatively, if that condition is determined to be objectively serious, I recommend finding that none of the actions of any individual defendant constitute deliberate indifference to that condition. Further, again assuming that the opiate withdrawal was an objectively serious condition and that any defendant acted with deliberate

---

[10] Informal policy of sheriff that medical staff should not disclose identity of inmates who are drug addicts to corrections staff in alleged violation of written policy that healthcare staff and corrections staff should "communicate about inmates who are drug or alcohol abusers." (ECF # 188 at 15-20). Investigation of Mark Shaver's death by Lt. Johnson was "sham" that constituted a ratification of purportedly defective informal policy of non-communication of inmate's status as a drug user. (ECF # 188 at 16-23; 37-40).

[11] ECF # 188 at 29-34.

[12] *Id.* at 4 (citing record).

[13] *Id.* at 42.

indifference, I recommending finding that none of the Portage County defendants are liable for maintaining a constitutionally defective policy or custom or for any failure to train. The conclusion will be a recommendation that all defendants be awarded summary judgment on the only federal claim in this case and that the Court decline supplemental jurisdiction over the remaining state law claims, dismissing them without prejudice.

## B.    Preliminary observations

### 1.    *Medical opiate withdrawal protocol and form*

#### a.    *Protocol*

Administering any particular treatment for opiate withdrawal at the Portage County jail is done under the opiate withdrawal treatment protocol followed at that facility.[14] Designed by defendant CHC and its subsidiary HPL,[15] the protocol states that the first steps are to obtain information as to the patient's history of drug use, determine and verify the patient's participation in any opioid treatment program and check vital signs, documenting the results.[16] If the patient can be proven to be in a federally-recognized opioid treatment program, and that program agrees to supply the medication it has prescribed for the patient,

---

[14] *Id.* at 6.

[15] ECF # 188 at 5. Defendant HPL is a wholly-owned subsidiary of CHC. *Id.* at 4. And, as noted earlier, HPL employs the medical defendants here. *Id.*

[16] ECF # 188-3 (Clinical protocols – opiate withdrawal/treatment), at 3-4.

the prison medical staff is to administer the medication and monitor the patient for adverse reactions.[17]

Section VII, part 1 of the protocol further states, however, if (1) participation in a recognized opioid treatment program cannot be established and/or (2) two or more of the symptoms outlined in an earlier section of the protocol exist, the staff is to "notify the on-call Provider."[18] Those symptoms are:[19]

     a.     Dilated pupils
     b.     Elevated pulse
     c.     Elevated blood pressure
     d.     Vomiting
     e.     Sweating
     f.     Rhinorrhea[20]
     g.     Lacrimation[21]
     f.     Piloerection[22]

---

[17] *Id.*, at 4-5.

[18] *Id.*, at 5 (emphasis added).

[19] *Id.*, at 4-5.

[20] Rhinorrhea is defined as when the nasal cavity is filled with a significant amount of mucous and is recognized as a symptom of opioid withdrawal. *See*, http://www.merckmanuals.com/professional/special_subjects/drug_use_and_dependence/opioids.

[21] Lacrimation is the excessive production of tears, and is also a recognized symptom of opioid withdrawal. *Id.*

[22] Piloerection is the erection of hair on the skin, commonly called "goose bumps" or "goose flesh" and is also a recognized symptom of opioid withdrawal. *Id.*

The medical staff may continue further with the opioid treatment protocol and administer any medication only if the notified physician approves and then only according to that physician's specific recommendations.[23]

In that regard, the next immediate section of the protocol recommends, but does not mandate, the medication to be prescribed by the physician at various levels of severity of opioid withdrawal.[24] Those increasing levels are: (1) "mild to moderate symptoms of withdrawal," and (2) "moderate to severe symptoms of withdrawal (vomiting, diarrhea, achiness and dehydration)."[25] The protocol further states in boldface lettering that "**Provider approval MUST be obtained prior to any prescription medication being administered.**"[26]

b. *POR form*

In connection with the protocol described above, the medical staff documented Mark Shaver's treatment on a Problem Oriented Record ("POR") furnished by CHC for specific use in cases of opiate withdrawal.[27] While consistent with the protocol policy described above, the POR form is not completely identical to it. For example, the POR contains a list

---

[23] ECF # 188-3, at 5.

[24] *Id.*, at 6. "Provider recommendations are intended to provide an example(s) of evidence based community practice treatment(s). These are not intended to replace a licensed clinician's case-specific assessment and treatment."

[25] *Id.*

[26] *Id.* (emphasis in original).

[27] ECF # 178-1 (POR for Mark Shaver).

of 13 "signs or symptoms" of opiate withdrawal that can be marked with a yes or no under columns for individual encounters with the patient.

But the 13 signs or symptoms listed in the POR for opiate withdrawal do not specifically include dilated pupils, rhinorrhea, lacrimation, or piloerection – all listed as symptoms of opiate withdrawal in the protocol – but do include arthralgia/myalgia,[28] "restless/irritable," "loss of appetite," "tremors of hand," "confusion," and "hallucinating" – none of which appear in the protocol as symptoms of opiate withdrawal. The focus on specific, particular symptoms is important because, as noted above, the protocol directs that a doctor be contacted if a person not on a recognized treatment program manifests two symptoms of withdrawal as those symptoms are outlined in the protocol.

Here, the absence of protocol-recognized symptoms from the POR means that a nurse treating a patient for possible opiate withdrawal would necessarily have to examine the patient for symptoms not listed on the POR before being able to determine – under the terms of the protocol – if the patient has two recognized symptoms of withdrawal and so that a doctor must be notified. Stated differently, the presence on the POR of a list of symptoms not specified in the protocol means that a nurse treating a patient for possible opiate withdrawal will be examining the patient for symptoms not directly relevant to whether the precise terms of the protocol for contacting a physician have been met.

---

[28] Arthralgia is commonly understood as joint pain and myalgia as muscle pain.

-8-

Notwithstanding this situation, the POR concludes by asking the nurse to conclude "yes or no" whether the patient is "in withdrawal" and "yes or no" whether the protocol should be started.[29]

## 2.      *Prison opiate withdrawal policy*

Portage County jail provides health care to inmates through a contractor – in this case, CHC through its subsidiary HPL.[30] Among other things, the agreement between Portage County and HPL states that in providing care to inmates HPL staff will operate within the scope of policies of the County or the Sheriff's Department that are posted and do not conflict with HPL policies and procedures.[31] Further, HPL, the County, and the Sheriff's Department all agree to "fully comply with" and to "implement all necessary policies and procedures" in order to comply with "the requirements of HIPPA" as it applies to providing medical services to inmates.[32]

As to the written policies of the Sheriff's Department, the policy on "detoxification services" states that if withdrawal symptoms are present, the medical staff is to "provide detoxification treatment as indicated in their established protocol."[33] Moreover, Sheriff's Department staff are directed to "promptly relay to the medical staff any immediate

---

[29] ECF # 178-1.

[30] ECF # 177-1, affidavit of Sheriff David Hoak, at 1 ¶¶ 2-3.

[31] *Id.*, agreement, at 14 ¶ 7.5.

[32] *Id.*, at 19 ¶ 10.4.

[33] ECF # 188-5, at 3.

emergency need which shall come to the attention" of the Sheriff's Department staff, but to "make no judgments in conflict with medical staff advice and instructions" and to "carry out such emergency orders [of the medical staff] as may be issued pending the arrival of professional staff."[34]

That said, there is some dispute over the policy actually followed regarding communication between the medical staff and the corrections officers under the requirements of HIPPA, especially as it relates to what is confidential information that may not be disclosed. Essentially, Shaver contends that "every member of the corrections and healthcare staff that you ask about inmate medical confidentiality gives a different response."[35] He argues that, with the exception of communicable diseases like HIV/AIDS or hepatitis C, the general belief by the prison administration is that specific inmate medical information may not be shared.[36] He states that this view is similar to that held by the nurses but that corrections staff are "unsure" of whether such medical information can be shared.[37]

## C.  Chronology of events

Unless otherwise noted, the following sequence of events is taken from either the medical staff motion for summary judgment or Shaver's response to the motions for summary judgment, together with exhibits. Citations to a brief are for ease of reference and

---

[34] *Id.* at 7.

[35] ECF # 188 at 16.

[36] *Id.* at 16-17.

[37] *Id.* at 17.

include, without further citation, a reference to the relevant portion of the Rule 56 record cited in the brief for the fact related.

Mark Shaver, age 32, was booked into the Portage County jail in the early morning hours of November 2, 2010,[38] after having been arrested for allegedly shoplifting some DVDs from an area Walmart.[39] LPN Beth Cruise, one of the named defendants, performed the initial intake medical assessment of Shaver[40] at approximately 6:45 a.m. on that day.[41] At that assessment, Shaver told Cruise that he had a history of heroin use and was concerned that he might go into withdrawal while incarcerated.[42] Cruise's uncontradicted testimony is that Shaver was in no apparent distress at the time of the intake interview and that he reported his last heroin use was at 9:00 p.m. the night before.[43]

Because of Shaver's heroin use, Cruise stated in the "Plan" portion of her medical progress notes that Shaver would be monitored for possible opiate withdrawal at the jail.[44]

---

[38] *Id.* at 4 (citing record).

[39] *Id.* at 3. The fourth amended complaint contains claims involving the arrest against Brimfield Township and the three arresting officers: Jerry Dumont, David Knarr, and David Blough. ECF # 110 at ¶¶ 44, 45, 46, 63, 66, 67, 69. Those parties were all dismissed from this case (ECF # 152) pursuant to a stipulation by Shaver (ECF ## 135, 151).

[40] *Id.* at 4.

[41] ECF # 178 (medical defendants' motion for summary judgment) at 5.

[42] ECF # 188 at 5; *see also*, ECF # 178 at 5.

[43] ECF # 178 at 5.

[44] ECF # 188 at 5.

-11-

She informed Shaver that the nurses would watch him and further told him that he should notify the medical staff of any changes to his condition or if further problems or concerns arise.[45] Cruise testified that she did not believe Shaver was experiencing active withdrawal at that time because he was not having symptoms of elevated blood pressure, elevated pulse, sweating, tremors, nausea, and vomiting.[46] Cruise had no further contact with Shaver.[47]

Shaver's next encounter with the nursing staff was at 4:00 p.m., when he was seen by nurse Dawn Hayter.[48] Hayter's notes on Shaver's POR regarding that visit show that she recorded a pulse of 90 and a blood pressure of 138/92[49] – essentially within normal limits for the pulse but somewhat elevated for the blood pressure.[50] As with all other encounters, there is no mention on the POR of whether Shaver was examined for other symptoms of withdrawal listed in the protocol such as dilated pupils, rhinorrhea, lacrimation, or piloerection – symptoms which, as noted, are not present in the check-boxes of the POR for opiate withdrawal.

_____

[45] ECF # 178 at 5.

[46] *Id.* There is no record of the exact blood pressure reading or pulse in the POR for this nursing contact.

[47] *Id.*

[48] *Id.* at 6.

[49] ECF # 178-1.

[50] *See*, http://www.heart.org/conditions (Website of the American Heart Association).

Nurse Vondakae Weekly saw Shaver later that evening at around 9:00 p.m.[51] She testified that Shaver complained of nausea, vomiting, and "some diarrhea," but that he had no tremors and no piloerection.[52] His vital signs were recorded as a pulse of 92 and blood pressure of 140/100 – an increase over both numbers recorded earlier in the afternoon.[53] Weekly noted the presence of "nausea/vomiting" and "diarrhea" on Shaver's POR.[54] Weekly testified that Shaver did not appear to be in distress and that she encouraged him to notify the medical staff of any changes, issues, or concerns.[55] She specifically instructed him to notify the medical staff of any future episodes of diarrhea or emesis (vomiting), since the medical staff would want to examine the appearance and content of any such discharge, and the security staff would want to verify any inmate complaints. Weekly, like Hayter and Cruise, did not believe Shaver was "in active withdrawal" and, like Cruise, did not encounter Shaver again.[56]

Sometime during the morning of the next day, November 3, Shaver approached corrections officer Jones and complained of "not feeling well."[57] In particular, he told Jones

---

[51] ECF # 178 at 6.

[52] *Id.* at 6-7.

[53] ECF # 178-1.

[54] *Id.*

[55] ECF # 178 at 7.

[56] *Id.*

[57] ECF # 177 at 6.

he was having difficulty holding his food down and was having diarrhea.[58] Shaver asked when the next med pass was and was told it would be around noon.[59]

Shaver was seen by the medical staff at that noon med pass on November 3.[60] Nurse Hayter signed the notes on the POR for that visit.[61] Jones testified that he told Hayter that Shaver was complaining of diarrhea and not being able to hold his food down.[62] Hayter noted on the POR, as had Weekly the night before, that Shaver had symptoms of nausea/vomiting, and recorded his pulse at 88 – a slight drop from the night before – and his blood pressure as 142/90 – a higher systolic pressure than the prior reading, and a continuation of the increasing pressure that had been documented since the first reading on the afternoon of the previous day.[63] She did not note any diarrhea.[64]

Later that afternoon, around 3:35 p.m., Shaver buzzed corrections officer Erica Tate on the intercom and told her that he had been told to contact the nurses if he had diarrhea.[65]

---

[58] ECF # 188 at 9.

[59] ECF # 177 at 6.

[60] ECF # 178 at 7.

[61] ECF # 178-1.

[62] ECF # 188 at 9.

[63] *Id.*

[64] *Id.*

[65] ECF # 177 at 7.

Tate contacted the nursing staff.[66] Based on that contact, nurse Dalesandro saw Shaver just moments later, at around 3:45 that afternoon.[67] Upon inspection, Dalesandro concluded that Shaver had a "loose stool," and not diarrhea.[68] Shaver was told to report any further episodes so they could be examined, and Dalesandro ordered PeptoBismol for nausea, which Shaver had again reported.[69] On the POR, Dalesandro marked "yes" for nausea/vomiting and, despite telling Shaver he had a loose stool, and not diarrhea, and describing it that way in the note section, she marked "yes" for diarrhea.[70] She did not take any vital signs.[71]

At 5:23 in that same afternoon of November 3, Shaver again contacted Tate to ask for a clean pair of pants because he had experienced another episode of diarrhea.[72] Tate communicated this information to Hayter, who told Tate to flush the bowel movement down the toilet and to give Shaver a new pair of pants.[73] Hayter did not personally see Shaver nor did she document this episode on the POR.[74]

---

[66] *Id.*

[67] ECF # 178 at 7.

[68] *Id.* at 8.

[69] *Id.*

[70] ECF # 178-1.

[71] *Id.*; *see also*, ECF # 188 at 10-11.

[72] ECF # 188 at 11.

[73] *Id.*

[74] *Id.*

Nurse Kelley English saw Shaver that evening less than four hours later, or around 9:00 p.m., for that evening's med pass.[75] The medical defendants make much of the fact that after the afternoon complaints of diarrhea Shaver "never again reported vomiting or diarrhea to the corrections staff or medical staff for inspection of the contents."[76] However, they are careful to explain that when Shaver was seen by English in the evening of November 3, "he complained of nausea and previous diarrhea" but did not report diarrhea "at that moment" nor complain of vomiting, as distinct from nausea.[77]

That said, English marked Shaver's POR as positive for nausea/vomiting and for diarrhea.[78] She listed his blood pressure at 158/100 – the third straight increase since the initial measurement the previous day – and his pulse at 88.[79] She testified that she did not believe Shaver was going through active withdrawal at that time and that he made no other complaints during her shift except for the prior complaints of diarrhea.[80]

---

[75] ECF # 178 at 8.

[76] Id.

[77] Id.

[78] ECF # 178-1.

[79] Id.

[80] ECF # 178 at 8.

The next morning, Jones was again the corrections officer on duty.[81] Similar to the previous day, Shaver told Jones at around 11 a.m. that he was not feeling well.[82] In addition, Jones testified that he witnessed Shaver leaning over a toilet, appearing to be vomiting.[83] Jones informed the nursing staff.[84]

Approximately 30-45 minutes after Jones's communication with the nursing staff, nurse David McCown saw Shaver during the noon med pass.[85] McCown's notes on the POR for that visit show that Shaver's blood pressure remained elevated (158/90) and that his pulse was the highest recorded (95).[86] McCown also marked "yes" for whether Shaver was experiencing nausea/vomiting and for diarrhea.[87] Significantly, McCown became the first nurse to note on the POR that Shaver was "in withdrawal."[88] But, despite that conclusion, McCown determined that the opiate withdrawal protocol should not be initiated and that the physician should not be contacted.[89]

---

[81] ECF # 188 at 12.

[82] *Id.*

[83] *Id.*; *see also*, ECF # 192 at 5.

[84] ECF # 177 at 8.

[85] *Id.*

[86] ECF # 178-1.

[87] *Id.*

[88] *Id.*

[89] ECF # 188 at 12.

Less than one hour later, Shaver was found unresponsive on the floor of his cell and was taken by ambulance to the emergency room.[90] He died there the next day.[91] The Summit County Medical Examiner conducted an autopsy.[92] The autopsy conclusion was that Shaver had died from complications from a ruptured cerebral aneurysm.[93]

Following his death, Sheriff Doak assigned Lt. Gregory Johnson, chief of the detective bureau, to conduct an investigation into Shaver's death.[94] Johnson's investigation found no evidence that jail policies and procedures were not followed.[95]

## Analysis

**A.    Relevant law**

*1.    Summary judgment*

The court should grant summary judgment if satisfied "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of

---

[90] *Id.* at 12-13.

[91] *Id.*

[92] *Id.* at 13.

[93] ECF # 177 at 10.

[94] *Id.* at 11.

[95] *Id.*

law."[96] The moving party bears the burden of showing the absence of any such "genuine issue":

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact.[97]

A fact is "material" only if its resolution will affect the outcome of the lawsuit.[98] Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards.[99] The court will view the summary judgment motion "in the light most favorable to the party opposing the motion."[100]

The court should grant summary judgment if a party who bears the burden of proof at trial establishes each essential element of his case.[101] Accordingly, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."[102]

---

[96] Fed. R. Civ. P. 56(c).

[97] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citing Fed. R. Civ. P. 56(c)).

[98] *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

[99] *Id.* at 252.

[100] *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

[101] *McDonald v. Petree*, 409 F.3d 724, 727 (6th Cir. 2005) (citing *Celotex*, 477 U.S. at 322).

[102] *Leadbetter v. Gilley*, 385 F.3d 683, 689 (6th Cir. 2004) (quoting *Anderson*, 477 U.S. at 248-49).

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmover.[103] The nonmoving party may not simply rely on its pleadings but must "produce evidence that results in a conflict of material fact to be solved by a jury."[104] Moreover, if the nonmovant presents evidence "merely colorable" or not "significantly probative," the court may decide the legal issue and grant summary judgment.[105] "In other words, the movant can challenge the opposing party to 'put up or shut up' on a critical issue."[106]

In sum, proper summary judgment analysis entails the threshold inquiry of determining whether there is the need for a trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.[107]

## 2. *Deliberate indifference standard*

There is no dispute that failure to provide necessary medical treatment to prisoners constitutes a violation of the Eighth Amendment's prohibition against cruel and unusual punishment. To establish the violation, plaintiff must demonstrate that defendants were deliberately indifferent to a detainee's serious medical needs.[108] Deliberate indifference has

---

[103] *Id.* at 256.

[104] *Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).

[105] *Anderson*, 477 U.S. at 249-50 (citation omitted).

[106] *BDT Prods. v. Lexmark Int'l*, 124 F. App'x 329, 331 (6th Cir. 2005).

[107] *Anderson*, 477 U.S. at 250.

[108] *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976).

been defined as "more than mere negligence, but 'something less than acts or omissions for the very purpose of causing harm or knowledge that harm will result.'"[109]

Deliberate indifference occurs when a defendant "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.[110]" Thus, the deliberate indifference standard contains both an objective and a subjective component.[111] The objective component addresses whether the deprivation was "sufficiently serious,"[112] and the subjective component addresses whether the officials acted with "a sufficiently culpable state of mind."[113] To establish the subjective component, however, a plaintiff "need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act

---

[109] *Foy v. City of Berea*, 58 F.3d 227, 232 (6th Cir.1995) (quoting *Farmer v. Brennan*, 511 U.S. 825, 835 (1994)).

[110] *Farmer*, 511 U.S. at 838.

[111] *Ross v. Duggan*, 402 F.3d 575, 590 n.7 (6th Cir.2004).

[112] *Caldwell v. Moore*, 968 F.2d 595, 602 (6th Cir.1992).

[113] *Id.*

despite his knowledge of a substantial risk of serious harm."[114] "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, ... and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."[115]

### 3.    *Failure to train/maintaining a policy or custom*

In general, it is well-settled in a § 1983 action that a municipality may not be held liable under the theory of *respondeat superior* for the actions of its employees.[116] Rather, a plaintiff seeking to establish municipal liability under § 1983 must ground the liability in "conduct properly attributable to the municipality itself."[117] Specifically, in order for liability to attach, a § 1983 plaintiff must show that a municipality engaged in a "'policy or custom'" that was "'the moving force'" behind the deprivation of the plaintiff's rights.[118] In that regard,

---

[114] *Farmer*, 511 U.S. at 842. Personal liability based on the subjective component, however, "must be based on the actions of [each] defendant in the situation that the defendant faced, and not based on any problems caused by the errors of others, either defendants or non-defendants." *Gibson v. Matthews*, 926 F.2d 532, 535 (6th Cir.1991). "The focus must be on whether any of the defendants had the personal involvement necessary to permit a finding of liability." *Clark-Murphy v. Foreback*, 439 F.3d 280, 291 (6th Cir.2006) (quoting *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir.1996)).

[115] *Farmer*, 511 U.S. at 842. (internal citations omitted).

[116] *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 691 (1978).

[117] *Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 404 (1997).

[118] *Powers v. Hamilton County Pub. Defender Comm'n*, 501 F.3d 592, 607 (6th Cir. 2007) (quoting *Monell*, 436 U.S. at 694).

a municipal "policy" is an officially adopted and promulgated statement, ordinance, regulation, or decision, where, by contrast, a municipal "custom" has not received formal approval through official channels but exists where officials know about and acquiesce in the practice at issue.[119]

> Where the claim involves a municipal "custom," the plaintiff must prove:
>
> (1) the existence of a clear and persistent pattern of violating federal rights ...; (2) notice or constructive notice on the part of defendants; (3) the defendants' tacit approval of the unconstitutional conduct, such that their deliberate indifference in failing to act can be said to amount to an official policy of inaction; and (4) that the defendants' custom was the "moving force," or direct causal link for the constitutional deprivation.[120]

To that end, the Sixth Circuit in *Fisher v. Harden*[121] (construing the Supreme Court's holding in *City of Canton v. Harris*)[122] held that a plaintiff in a § 1983 action may hold a municipality liable for the unconstitutional acts of its police officers upon successfully showing that the municipality maintained the custom of improperly training its police force. To prevail on such a claim of improper training in light of the larger rubric of establishing an unconstitutional municipal custom, the plaintiff "must prove that the [municipality] was deliberately indifferent to the rights of its citizens that came into contact with [the police]"[123]

---

[119] *Powers*, 501 F.3d at 607 (citations omitted).

[120] *Id.* (citations omitted).

[121] *Fisher v. Harden*, 398 F.3d 837 (6th Cir. 2005).

[122] *City of Canton v. Harris*, 489 U.S. 378 (1989).

[123] *Fisher*, 398 F.3d at 849 (citing *City of Canton*, 489 U.S. at 392).

by "show[ing] prior instances of unconstitutional conduct demonstrating that the [municipality] has ignored prior instances of abuse and was clearly on notice that the training in this area was deficient and likely to cause injury."[124]

In that regard, as the Supreme Court specifically observed in *City of Canton v. Harris*, it is not enough that a plaintiff in this circumstance show that an individual officer was improperly trained, or that the particular injury or accident at issue might have been avoided with better training.[125] The Court noted proof in that form is insufficient for liability because a particular officer's deficient training may be the result of an adequate program being poorly administered, and that even adequately trained officers make mistakes; "the fact that they do says little about the training program or the legal basis for holding the city liable."[126]

## B.    Application of relevant law

As noted, there are two parts to establishing that a defendant acted with deliberate indifference to a serious medical need, thus creating liability. I initially consider the so-called "objective" prong of the test, which is whether the Shaver Estate has shown the presence of an "objectively serious medical need" during Shaver's period of incarceration. This factor is applicable to all defendants.

The Sixth Circuit has described an objective medical need as "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay

---

[124] *Id.*

[125] *City of Canton*, 489 U.S. at 390-91.

[126] *Id.*

person would easily recognize the necessity for a doctor's attention."[127] Further, nurses are held to a higher level of responsibility as to recognizing medical needs and risks because of their professional training.[128] Moreover, the objective element of the deliberate indifference standard recognizes "sufficiently imminent dangers" to the inmate, and not just current serious health problems.[129]

In that regard, the Estate argues that opiate withdrawal is an objectively serious medical need and has been "firmly established" as such by the Sixth Circuit.[130] The medical defendants assert that the principal case relied on by the Estate – *Finn v. Warren County* – does not reach the categorical conclusion attributed to it by the Estate, but, in ways that are distinguishable from this case, finds that the inmate there was exhibiting specific symptoms

---

[127] *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008). As Judge Pearson recently noted in an extensive discussion of the objective component of the test for establishing a serious medical need, there are three "branches" of cases in this regard. First are those cases where the need is so obvious that even a lay person would recognize the need for a doctor's attention. Second are the situations where the seriousness of the prisoner's medical needs may be established by the effect of a delay in treatment. Third are those cases where the seriousness is established by the diagnosis of a physician. *Sanford v. Stewart*, NO. 5:11CV2360, 2013 WL 6903780, at * 9 (N.D. Ohio Dec. 31, 2013) (citations omitted). Here, as in *Sanford*, the Estate does not indicate which analysis is proper here.

[128] *Spears v. Ruth*, 589 F.3d 249, 255 (6th Cir. 2009); *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 550 (6th Cir. 2009).

[129] *Helling v. McKinney*, 509 U.S. 25, 34 (1993); *Stefan v. Olson*, 497 F. App'x 568, 577 (6th Cir. 2012) (citing *Helling*).

[130] ECF # 188 at 24-25 (citing *French v. Daviess County*, 376 F. App'x 519, 522 (6th Cir. 2010); *Preyor v. City of Ferndale*, 248 F. App'x 636, 642 (6th Cir. 2007); *Finn v. Warren County*, No. 1:10-CV-00016-JHM, 2012 WL 3066586 (W.D. Ky. July 27, 2012) (reversed in part on other grounds, ___ F.3d ___, No. 13-6629, 2014 WL 4547844 (6th Cir. (Ky.) Sept. 16, 2014)).

from which the attending nurse could have inferred that the risk of substantial harm existed.[131]

The case authority is clear that any determination of a serious medical need is usually a function of the specific facts of the case. As the Sixth Circuit noted in *Border v. Trumbull County Board of Commissioners*,[132] a mere generalized state of intoxication in a pretrial detainee, without more, is "insufficient to establish serious medical need...."[133] In that regard, *Preyor*, cited by the Estate, also stands for the proposition that a serious medical need is usually established by the particular facts of the case and not by citation to any general category of conditions.[134]

Of particular importance here, the Sixth Circuit, citing the Clinical Practice Guidelines for Detoxification of Chemically Dependent Inmates of the Federal Bureau of Prisons, noted that "the precise trajectory of a particular individual's withdrawal symptoms is difficult to

---

[131] ECF # 191 at 6-7.

[132] *Border v. Trumbull County Bd. of Comm'rs*, 414 F. App'x 831 (6th Cir. 2011).

[133] *Id.* at 837-38 (citations omitted).

[134] *Preyor*, 248 F. App'x at 642 (serious medical need demonstrated by evidence that the detainee, a diabetic who was undergoing heroin withdrawal, vomited, suffered bouts of diarrhea, was seen lying on the cell floor and told officers he was not well and believed he was detoxing from heroin). By contrast, *French*, also cited by the Estate, merely notes that courts in other circumstances have found withdrawal symptoms to qualify as a serious medical need, and so the court will "assume" that French's "apparently strong addiction to Xanax" was a serious medical condition." *French*, 376 F. App'x at 522. *Finn*, the final case relied on by the Estate, held that the Sixth Circuit has recognized the specific condition of *delirium tremens* as being a serious medical need. *Finn*, 2012 WL 3066586, at *7 (citing *Bertl v. City of Westland*, No. 07-2547, 2009 WL 247907 (6th Cir. Feb. 2, 2009)).

forecast."[135] Indeed, the Sixth Circuit observed, while discontinuing the use of narcotics can produce dangerous withdrawal symptoms, "'[t]he intensity of withdrawal cannot always be predicted accurately' due to 'many factors including the physiology, psychology and neurochemistry of the individual using the substance.'"[136]

Similarly, a district court in Maine, applying a recent First Circuit case, has concluded that "[o]piate withdrawal symptoms can rise to the level of an objectively serious medical need" but that not "every inmate cut off from a pre-incarceration opiate prescription will necessarily present a serious medical need for withdrawal treatment."[137] In that regard, a very recent decision by a federal district court in the Western District of New York rejected the plaintiff's contention that "drug/alcohol withdrawal always qualifies as an objectively serious medical condition." The court in *Iacovangelo v. Correctional Medical Care, Inc*.[138] noted that the ultimate answer to whether the withdrawal constitutes an objectively serious medical condition "depends on the particular symptoms that the inmate is exhibiting."[139] It noted

---

[135] *Bruederle v. Louisville Metro Govt.*, 687 F.3d 771, 773 (6th Cir. 2012).

[136] *Id*. at 774 (quoting Federal Bureau of Prisons, *Clinical Practice Guidelines: Detoxification of Chemically Dependent Inmates*, at 4 (2000)).

[137] *Sirois v. Cichon*, No. 1:12-CV-00028-MJK, 2013 WL 5960860, at *6 (D.Me. Nov. 7, 2013) (citing *Ramos v. Patnaude*, 640 F.3d 485, 487-89 (1st Cir. 2011)). I note that the opinion in *Ramos* is by retired Justice Souter, sitting by designation.

[138] *Iacovangelo v. Corr. Med. Care, Inc.*, No. 13-CV-6466 CJS, 2014 WL 4955366 (W.D.N.Y. Oct. 2, 2014).

[139] *Id.*, at *10 (citation omitted).

further in that regard that "mild withdrawal symptoms, such as vomiting, do not necessarily qualify as an objectively serious medical condition."[140]

The cases cited here by the *Iacovangelo* court found, for example, that symptoms of a seizure, vomiting, diarrhea, and dehydration for two days "do not generally provide the basis for an Eighth Amendment claim."[141] Further, "physical pain and morphine withdrawal," accompanied by mild nausea, no vomiting and/or diarrhea, "mild" anxiety, and "very mild headaches" during six days did not establish as a matter of law that the inmate had a serious medical condition related to his morphine withdrawal.[142] And, in the particular circumstance of *Iacovangelo* itself, the court determined that a single instance of the inmate being observed "bending over a toilet, presumably to vomit" was not sufficient to plausibly allege that the inmate's withdrawal symptoms were "objectively serious."[143] Indeed, the First Circuit in *Ramos v. Patnaude* specifically noted that "any detoxification of a substantial drug user will involve vomiting and diarrhea" but that such facts do not necessarily create an objectively

---

[140] *Id.* (citations omitted).

[141] *Avallone v. Hoffman*, No. 2:06-CV-253, 2:07-CV-1, 2009 WL 2957955, at *5 (D.Vt. Sept. 9, 2009).

[142] *Feder v. Sposato*, No. 11-CV-193 JFB WDW, 2014 WL 1801137, at *8 (E.D.N.Y. May 7, 2014).

[143] *Iacovangelo*, 2014 WL 4955366, at *10.

serious medical condition supporting a claim of deliberate indifference where the inmate's withdrawal is being managed under a treatment protocol.[144]

Thus, in sum, the weight of authority suggests that the Estate has not established that Shaver's withdrawal was an objectively serious medical condition. The salient facts in this respect are that Shaver was acknowledged from the beginning of his incarceration to be a drug user and so likely to undergo withdrawal while incarcerated but was not immediately placed on withdrawal medication nor was the physician notified. Rather, his condition was regularly observed by the nursing staff and his vital signs, including signs particular to opiate withdrawal, were regularly charted. While it is clear that the signs listed in the POR and the signs identified in the protocol are not totally identical, the signs specified in the POR are uncontested evidence that the medical defendants here, in conformity with the authority cited above, viewed opiate withdrawal as something that was not *ab initio* an objectively serious medical condition but a condition that *could become* serious depending on a number of unpredictable factors, such as the response of the inmate to the withdrawal process.

Further, as the medical defendants point out, the Estate's own expert here, James Gebel, Jr., M.D., testified that Shaver's symptoms of withdrawal were "not severe from the standpoint that it's [sic] resulting in this protracted nausea, vomiting, [and] diarrhea. I mean certainly it's not severe in the sense that this is something that in and of itself in ordinary

---

[144] *Ramos*, 640 F.3d at 491. I also note that the Seventh Circuit recently stated that "[v]omiting, in and of itself, is not an uncommon result of being mildly ill, and, absent other circumstances ... does not amount to an objectively serious medical condition." *Gayton v. McCoy*, 593 F.3d 610, 621 (7th Cir. 2010).

circumstances would be expected to be life threatening or something like that.[145] Stated differently, Dr. Gebel's testimony is that while the vomiting and diarrhea in Shaver's particular case was severe enough to precipitate the rupture of his aneurysm – a weakened blood vessel that was unknown to anyone at the time[146] – and so cause Shaver's death, he did not have an opinion as to how severe the withdrawal symptoms were from the standpoint of "addiction medicine."[147]

Accordingly, considering the Rule 56 record in the light most favorable to the Estate as the party opposing the motion, I recommend finding as a matter of law that the Estate has not established that Shaver's opiate withdrawal was an objectively serious medical condition. Rather, the uncontroverted evidence is that Shaver was in the early stages of withdrawal that could – as in any withdrawal – later become a serious medical condition, depending on the circumstances. As such, by the Estate failing to establish the existence of an objectively serious medical condition at the beginning, there is no basis for finding deliberate indifference in this matter.

That said, if it is determined that Shaver's opiate withdrawal was an objectively serious medical condition, I recommend, in the alternative, that the Estate be found not to

---

[145] ECF # 191 at 5 (quoting ECF # 175 at 76).

[146] Dr. Gebel's testimony is that the aneurysm likely was the result of a childhood injury, and that the injury produced a weakening in Shaver's blood vessels that worsened over time. *Id.* at 39-40.

[147] *Id.* at 79.

have established the second, or "subjective" component of liability for deliberate indifference.

The subjective element requires that the Estate show that: (1) the defendants knew of facts from which the inference could be drawn that Shaver was at substantial risk of serious harm, (2) the defendants actually drew that inference, and (3) the defendants then disregarded that risk.[148] This subjective requirement is designed "to prevent the constitutionalization of medical malpractice claims; thus a plaintiff alleging deliberate indifference must show more than negligence or misdiagnoses of an ailment."[149] In that regard, the Sixth Circuit has stated that the mental state of a prison official who has been deliberately indifferent to a prisoner's medical needs is akin to recklessness:

> When a prison doctor provides treatment, albeit, carelessly or inefficaciously, to a prisoner, he has not displayed deliberate indifference to the prisoner's needs, but merely a degree of incompetence which does not rise to the level of a constitutional violation. On the other hand, a plaintiff need not show that the official acted "for the very purpose of causing harm or with knowledge that harm will result." Instead, "deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk."[150]

Thus, "[w]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second-guess medical

---

[148] *Rouster v. County of Saginaw*, 749 F.3d 437, 446 (6th Cir. 2014) (citations omitted).

[149] *Id.* (quoting *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001)).

[150] *Id.* at 447 (internal citations omitted).

-31-

judgments and constitutionalize claims that sound in state tort law."[151] That said, a prisoner need not show that "he was literally ignored by [the medical] staff" to prevail on an Eighth Amendment claim but need only show that "his serious medical needs were consciously disregarded."[152] Rather, courts generally find constitutionally deficient treatment where medical care was provided only when "there is evidence tending to establish that the physician is present while the inmate is in distress, that distress is communicated to the physician, and the physician purposefully ignores the distress, knowing that an adverse outcome is likely to occur."[153]

As to application of the subjective element to individual, non-medical jail personnel, the Sixth Circuit teaches that "'if a prisoner is under the care of medical experts ..., a non-medical prison official will generally be justified in believing the prisoner is in capable

---

[151] *Ascencio v. Toss*, No. 4:10CV0849, 2010 WL 2836784, at *2 (N.D. Ohio July 20, 2010) (internal quotation omitted); *see also*, *Jones v. Muskegon County*, 625 F.3d 935, 944 (6th Cir. 2010) ("[C]ourts are generally reluctant to second guess the medical judgment of prison medical officials.").

[152] *Rouster*, 749 F.3d at 448 (citations omitted).

[153] *Id.* at 449 (quoting *Jones*, 625 F.3d at 945). In addition to this standard, some courts have found deliberate indifference in medical mistreatment cases where a plaintiff can show that the care given was "grossly inadequate," as in where the need for treatment is obvious and the resulting treatment is so cursory as to amount to no treatment at all. *See*, *Sanford*, 2013 WL 6903780, at **12, 16 (nurses treatment of plaintiff's complaints of chest and leg pain, fever, and inability to walk with Motrin and warm compresses stated a claim for deliberate indifference due to grossly inadequate care); *Padula v. Trumbull County, Ohio*, No. 4:10CV2876, 2012 WL 3260231, at **6-7 (N.D. Ohio Aug. 8, 2012) (collecting cases); *see also*, *Preyor*, 248 F. App'x at 644 (jury could find that treating a diabetic undergoing heroin withdrawal and seen lying on the floor with aspirin and an enema constituted deliberate indifference).

hands."[154] Pointing to the Supreme Court's holding that, for liability to attach on a deliberate indifference claim, an official must both be aware of facts from which the inference of a substantial risk of serious harm could be drawn and then actually draw that inference, the Sixth Circuit has stated that "absent a reason to believe (or actual knowledge) that the prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official ... will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference."[155]

That said, evidence that medical personnel or jail personnel did not follow established policy is circumstantial evidence – though not *per se* conclusive proof – that the personnel involved acted with awareness of facts from which an inference could be drawn that the prisoner was at substantial risk of serious harm.[156] Further, jail staff "may not escape liability [for deliberate indifference] if the evidence shows that [they] merely refused to verify underlying facts that [they] strongly suspected to be true, or declined to confirm inferences of risk that they strongly suspected to exist."[157]

---

[154] *Smith v. County of Lenawee*, 505 F. App'x 526, 532 (6th Cir. 2012) (internal citation omitted).

[155] *Id*. at 532-33 (citing *Farmer*, 511 U.S. at 837).

[156] *Harris v. City of Circleville*, 583 F.3d 356*,* 368-69 (6th Cir. 2009) (citing *Bertl*) (jail non-medical staff); *Bertl*, 2009 WL 247907, at *6 (jail medical staff); *Ham v. Marshall County*, No. 5:11-CV-00011, 2013 WL 6017441, at *8 (W.D. Ky. Nov. 13, 2013).

[157] *Phillips v. Roane County, Tennessee*, 534 F.3d 531, 541 (6th Cir. 2008) (citation and internal quotation marks omitted).

## 1. Non-medical jail staff

Here, as to officers Jones and Tate, the evidence is that they noted Shaver experiencing various symptoms that were not immediately obvious as life-threatening and promptly reported those symptoms, and their interaction with Shaver, to the medical staff. Thus, there is no evidence that these officers refused to verify facts of a serious medical need that they thought to be true, but rather relied on the fact that Shaver was under the care of the prison medical staff. Moreover, both these officers followed the written jail policy, noted above, of relaying information concerning their observations of a prisoner to the medical staff and making no decisions in conflict with the instructions of the medical staff.

Thus, even if it is assumed that the Estate has shown the existence of an objectively serious medical condition here, it has not shown that the non-medical jail staff had actual knowledge of any fact that would lead them to infer that Shaver was at substantial risk of serious harm. As was also stated above, because there is no dispute that these officers were without actual knowledge, or reason to believe, that the medical staff was mistreating Shaver, they cannot be found to be deliberately indifferent to his medical situation.

## 2. Medical staff

Like the situation in *Bruederle*, the Estate's arguments about the subjective component of deliberate indifference as applied to the jail medical staff appear to hinge on whether the staff's failure to fully follow the withdrawal policy in all respects constitutes deliberate indifference. Like *Bruederle*, I recommend finding that the staff's actions do not constitute deliberate indifference.

-34-

There is no dispute that from the beginning the medical staff was aware that Shaver was a drug user and so at risk of experiencing some level of withdrawal symptoms. Further, there is no dispute that the staff placed Shaver on withdrawal monitoring, taking vital signs at regular intervals, and watching for signs that would indicate if the withdrawal process had progressed to where a physician should be contacted and medication prescribed. There is also no dispute that while being monitored Shaver experienced withdrawal symptoms of nausea, vomiting, diarrhea, elevated blood pressure, and an elevated heart rate. There is finally no dispute that, notwithstanding these symptoms, Shaver was not listed as being actively in withdrawal until just a few hours before he collapsed and was taken to the hospital.

That said, however, the Estate has presented no evidence that every case of opiate withdrawal mandates immediate intervention by a physician or immediate medication from the first moment it is known to the medical staff, relying instead on the incorrect assertions that such withdrawal is *per se* an objectively serious medical condition. Actually, as was discussed above, opiate withdrawal has the potential to be such a serious condition depending on a number of factors.

Here, by placing Shaver on the opiate withdrawal monitoring protocol based on Shaver's intake interview, the medical staff recognized both Shaver's risk of developing serious withdrawal symptoms and began a process for observing whether or not he actually developed serious withdrawal symptoms. The Estate has presented no reason to conclude that it was not within reasonable medical judgment to conclude that Shaver presented no immediate risk of serious harm when he was admitted to jail such that he required immediate

medication. Nor have they provided any reason to conclude that it was medically unreasonable to monitor Shaver under a withdrawal protocol to see if he eventually developed symptoms of serious withdrawal. In this sense, Shaver did not present the same situation as in *Stefan v. Olson*,[158] where the jail nurse was found to be deliberately indifferent to an alcoholic going through withdrawal who experienced seizures two prior times while undergoing withdrawal – a fact the nurse should have known by checking the inmate's record.

Simply put, the Estate has produced no Rule 56 evidence beyond the asserted failure to follow the withdrawal protocol, and in particular, the elevated blood pressure readings, that any of the nurses here were aware of any significant risk to Shaver. The Estate argues that the nurses here did not follow the HPL/CHC opiate withdrawal policy when they observed Shaver's symptoms, which policy provides that if an inmate has two listed symptoms of opiate withdrawal, the nurse should contact the physician.[159] Thus, the Estate contends, there is a factual issue as to whether the nurses were deliberately indifferent.[160]

But, as Justice Souter stated in *Ramos*, even where the undisputed facts show that the medical personnel underestimated the risk present in a given situation, "misjudgment, even

---

[158] *Stefan v. Olson*, No. 1:10 CV 671, 2011 WL 2621251, at *11 (N.D. Ohio July 5, 2011); *aff'd*, 497 F. App'x 568 (6th Cir. 2012).

[159] ECF # 188 at 29-35.

[160] *Id.*

negligent misjudgment, is not deliberate indifference."[161] Indeed, the Sixth Circuit has also specifically found that "[n]egligence in diagnosing a medical condition does not constitute unconstitutional deliberate indifference."[162]

Thus, remembering that failure to follow a policy is no more than circumstantial evidence of deliberate indifference, and not conclusive proof of it, the evidence of the nurses's failure to properly and timely diagnose the severity of Shaver's withdrawal because of the terms of the withdrawal protocol is, at best, evidence of negligence in implementing that protocol.  An argument can be made that, because of the terms of the protocol, the nurses here *should have* recognized the true meaning  of the symptoms they were noticing, *should have* "connected the dots" of these symptoms sooner, and so *should have* contacted a physician, "but that is the language of medical malpractice, not deliberate indifference."[163] It is not enough as regards the subjective prong of deliberate indifference that the Estate demonstrate a question of fact as to what the nurses *should have known* about Shaver's condition from the symptoms he displayed.[164] Indeed, "an official's failure to alleviate a significant risk he *should have* perceived, but did not, while no cause for commendation,

---

[161] *Ramos*, 640 F.3d at 490.

[162] *Jones*, 625 F.3d at 945 (citing *Bertl*, 2009 WL 247907, at *14).

[163] *Bruederle*, 687 F.3d at 778 (citation omitted).

[164] *Id.* (emphasis original) (citation omitted); *see also*, *Border*, 414 F. App'x at 837 ("'When dealing with medical care for detainees, negligence does not state a cause of action under § 1983.'") (quoting *Watkins v. City Battle Creek,* 273 F.3d 682, 686 (6th Cir. 2001)).

cannot ... be condemned as the infliction of punishment [and so a violation of the Eighth Amendment]."[165]

Accordingly, even if it is found that the Estate established that Shaver's opiate withdrawal was an objectively serious medical condition, I recommend finding as an alternative that the Estate has not met its burden of showing any material fact in dispute as to the subjective element of deliberate indifference as relates to the prison medical staff that would make their liability an issue for the jury.

*3.      Conclusion – deliberate indifference*

For the reasons stated, I recommend first that the jail staff and medical staff defendants be entitled to summary judgment on the basis that, as a matter of law, Shaver's opiate withdrawal was not an objectively serious medical condition, or, alternatively, that none of these defendants were deliberately indifferent to Shaver.

*4.      Portage defendants*

The Portage defendants are considered under the rubric of failure to train and/or for maintaining a policy or custom that resulted in Shaver suffering the deprivation of a constitutional right.

Initially, if the recommendation that there was no objectively serious medical need is adopted, there can be no liability for any Portage defendant because there was no underlying constitutional violation. Similarly, if the alternative finding is adopted that there was no

---

[165] *Comstock*, 273 F.3d at 703 (internal quotations omitted, emphasis added).

subjective deliberate indifference on the part of any member of the medical or jail staff, there also can be no liability for any Portage defendant based on any failure to train or for maintaining a constitutionally infirm policy or custom.

As yet another alternative finding, I recommend finding that even if the Estate had shown the presence of a jury issue on the question of whether any defendant acted with deliberate indifference to Shaver's medical condition, there is no basis for any liability to attach to Portage defendants for failure to train or for maintaining a policy or custom that was the moving force behind the deliberate indifference.

First, although the Estate claims that the existence of a constitutionally infirm policy or custom is established by an allegedly incomplete investigation into Shaver's death, the Estate cannot prove that point by an "isolated, one-time event"[166] of the sheriff's investigation in this matter. It is well-established that to create liability under a policy or custom approach the plaintiff must show more than a single instance of the allegedly defective policy but must show "prior instances of unconstitutional conduct demonstrating that the [county] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury."[167]

---

[166] *Fox v. Van Oosterum*, 176 F.3d 342, 348 (6th Cir. 1999).

[167] *Miller v. Sanilac County*, 606 F.3d 240, 255 (6th Cir. 2010).

Thus, to the extent the Estate seeks to establish liability on the basis of Lt. Johnson's investigation done at the direction of Sheriff Doak, that claim cannot proceed, and these defendants are entitled to summary judgment in their favor.

Moreover, this is clearly not a case where the defendants have failed to offer any kind of training or preparation for this situation.[168] Rather, the Portage County defendants have engaged the medical defendants to provide medical services to inmates; the medical defendants have created a policy that specifically addresses withdrawal; and that policy was specifically referenced by the medical staff in this case. Further, not only has the Estate failed to show any prior instance of where the Portage defendants were placed on notice concerning a constitutional defect in this approach, the Estate has not provided any evidence whatsoever of what other policy was constitutionally required in this case. That is, the Estate has not shown that the policy of having the jail medical staff regularly monitor an inmate with a known history of opiate use for relevant symptoms of withdrawal under a written protocol, with a physician contacted and medication given only when the withdrawal symptoms reach a certain severity, is constitutionally inadequate.[169]

Finally, any attempt to fashion liability against Portage defendants such as the County itself, the Board of Commissioners, or the Sheriff, under a theory of *respondeat superior* will

---

[168] *See*, *Blackmore v. Kalamazoo County*, 390 F.3d 890, 900 (6th Cir. 2004).

[169] *See*, *Kindl v. City of Berkley*, No. 12-CV-13410, 2013 WL 4496253, at *11 (E.D. Mich. Aug. 21, 2013).

not suffice. Accordingly, summary judgment against these defendants on such a theory is warranted.

5. *Conclusion – failure to train/maintaining a policy or custom*

For the reasons stated, even if a constitutional violation is established on the basis of deliberate indifference of individual members of the medical or corrections staff, the Estate's claims against the other Portage defendants that are based on an allegedly defective policy or custom, or on a failure to train, are, as a matter of law, insufficient to obtain relief. Thus, these defendants are entitled to summary judgment.

6. *Supplemental jurisdiction*

In light of the foregoing recommendations, only state law claims remain. Under 28 U.S.C. § 1367(c)(3), this Court may decline to exercise supplemental jurisdiction over these state law claims once it has dismissed all claims over which it had original jurisdiction. Specifically, in "determining whether to retain jurisdiction over state-law claims, a district court should consider and weigh several factors, including the values of judicial economy, convenience, fairness, and comity."[170] The Sixth Circuit further teaches that "[w]hen all federal claims are dismissed before trial, the balance of considerations will usually point to dismissing the state law claims...."[171]

---

[170] *Gamel v. City of Cincinnati*, 625 F.3d 949, 951 (6th Cir. 2010) (internal quotations omitted).

[171] *Id.* at 952.

-41-

Here, the Court does not have independent diversity jurisdiction over the claims that do not arise under federal law. Thus, considering the various factors involved, I recommend that there is no reason to deviate from the established general practice of declining to exercise supplemental jurisdiction over the Estate's claims grounded in Ohio law. Accordingly, I recommend that those claims be dismissed without prejudice.

## Conclusion

For the reasons stated, I recommend that summary judgment be granted to all defendants on the single federal law claim asserted by the Estate on the grounds set forth above, and that the Court then dismiss without prejudice the remaining claims that arise under Ohio law.

Dated: October 31, 2014                         s/ William H. Baughman, Jr.
                                                United States Magistrate Judge

## Objections

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days of receipt of this notice. Failure to file objections within the specified time waives the right to appeal the District Court's order.[172]

---

[172] *See*, *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also*, *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).